Good morning. My name is Loretta Griffin and I represent AVI International, Inc. May I please report? We are here on appeal from a juvenile defendant. And there are a number of issues. I apologize for my voice as I go into this. I'm going to do my best here. I'm really struggling. It's going around. I saw your hand caught. So I have a very lengthy brief. I had a very lengthy post-trial motion. This case involves, I'm going to just touch on a few points here, but the court can redirect me if they want me to discuss anything specific. This is an industrial accident, October 7th of 2007. October 8th of 2007. It is, they're moving a large industrial pump out of a plant at DNG. And they hired a group of union pipefitters, PMC, who was the third party defendant. And then my client is going to do the servicing on the pump. They're going to take it back to Connecticut. So we have four parties. We have my client, DMG, whose plant it is, whose pump it is, whose forklift driver it is. And PMC, the crew that is doing the rigging and bringing down the pump. What was AVI hired to do? AVI was hired to provide detention tools and to transport the pump to its facility, service it, and transport it back. I mean, they were specifically hired to come in, get the pump, move it to their own facility, and to have an on-site representative to supervise that move, right? AVI was not. So there was conflicting testimony, although nothing specific. I'm going to note, Judge, somebody saying that we, in fact, were there to supervise that PMC crew. We didn't hire them. DMG hired that crew. Okay, that's not what I asked you. I mean, AVI was hired to move the pump and to have an on-site representative to somehow be involved in the move. I'm trying to remember the exact language. It came out of an agreement, didn't it? It was an agreement, which is a record. They were there to provide technical expertise on getting the pump out. And they had, on other occasions, provided the fork and the crew to put it on the cart, rig it, and get it out. On this occasion, we were not asked to do that. They wanted the Union pipefitters to do that, and DMG hired the Union pipefitters to do that. So that was their operation. There's no testimony from the PMC crew. In fact, they were asked, who supervised you? Our foreman supervised us. Who's driving the fork? DMG's employees driving the fork. We don't give instruction, and, in fact, the way the testimony unfolds, our on-site representative is counseled, very artfully elicits testimony that he's wrong for not trying to supervise it. But he has one, it's his understanding he hasn't been hired to do that. So why was he on site then? They're going to, he was, they had their detection tools, and there is some expertise required in getting the pump out of where it's at and getting it down to the cart. Now, once it gets down to the cart, PMC places it on the cart, and PMC rigs it. They're attaching it to the cart. DMG's going to push it through their plant, their own plant. So it's got, the pump's got big wings, and there's columns that are part of the industrial setting. And that's what's happening here. So what happens procedurally in this trial is when the plaintiff rests their case, the court directs a verdict against my client, AVM, at the close of the plaintiff's evidence. We move for a directed verdict, but the court hears their motion for a directed verdict first, and the predicate for that is judicial admission. So they take the extraordinary step of asking for a verdict in their favor on all bases. I've got two counts at this point because the week before we start the trial, the plaintiff adds a products liability count. For the first time, they pre-products against my client for the provision of the cart. And I'm going to get to that. I'll jump to it if you want me to. Let me ask you this. On that denying the motion to continue, was there a record on that? I haven't reviewed the record yet to see if there was an explanation of what the court's reasoning was on denying the motion to continue. I believe the court just said the motion is denied. So for our record to review, there's— I don't believe the court gave an explanation on that. Likewise, there is, in the record, you will not find the precise predicate for judicial admission. What was the judicial admission? What was the charge of negligence? Or how does the products liability become the subject of judicial admission? The best I got was at the post-trial stage where I got he had the play in front of him. They're talking about my employee on site thinking that the rigging was not as safe as it could have been. On that basis, I get duty, breach, proximate cause on the negligence count, and unreasonably dangerous product, and proximate cause on the products liability count. It's just that there is no—the law does not recognize that. Not just on the product liability count, but on the negligence count as well. Both counts. Right. Both counts were directed before ADF puts on any of them. So whether you view these as judicial admissions or evidentiary admissions, if representatives of AVI get on the witness stand and basically admit to negligence, and proximate cause, et cetera, et cetera, on the negligence count, what difference does it make? If it happened, Judge? If that happened? If we said, yes, we were negligent and we think we caused the accident? Because it is undisputed that we weren't driving the fork. Everybody said the fork controlled the movement of the pump. They're charging us with that. And AVI's representative said, I looked at the fork and I knew they didn't rig it right. And somebody could get hurt and I didn't say anything. Right?  How does that not go to a jury? Let's say that he thought that. I thought the way my driver was driving was not appropriate, but I didn't say anything to him. I thought maybe my driver was intoxicated. I didn't say anything to him when I got in the car. How does that get directed as a matter of law? How does that not go to a jury? Where is the case law that says that does not get submitted to a jury as a question of fact? And remember, this isn't just one directed verdict. We get directed on the products count as well. The evidence is that we made one card, one card, for our use in our service industry. So the law on judicial admission. Well, let's get back to my question. What difference does it make if it's a judicial admission or an evidentiary admission if AVI representatives get on the stand and admit to all of the elements of the cause of action? Because the judicial admission takes it from the evidence judge. The judicial admission precludes any other evidence on the point. It says this is dumb. We don't get any more evidence. Now remember, AVI hadn't even begun to put out its case when this gets directed. We hadn't had the opportunity to call a witness when this gets directed. Did other witnesses from AVI get on the stand and contradict the witnesses from AVI who had already testified? Did we have that opportunity? I'm just asking. We were foreclosed. Was there anybody else there? There was a motion saying we couldn't do it. The only issue left for us was the comparative fault of other parties. Did you make a record of who you had out in the wings who would come in and say these other representatives of AVI, I don't know what they're talking about, here's what really happened? I don't believe I did. That's what I'm asking. You said you never got a chance. Please don't talk over me. My question is, you said you didn't get a chance to present other evidence. Did you make a record of what other evidence you would have presented? We did not make an offer of proof after that happened, Judge. I will tell you that we were shocked. I've never seen it. Never seen anybody enter a directed verdict at the close of a plaintiff's case against a defendant. I've seen it the other way, but very, very rarely. Usually it's reserved, even when I have a good ground. We wait and see what the evidence is. But here, I don't see how you take this as a matter of law away from a fact finder. And you do it before we even have a chance to put on any evidence. And the court's suggesting I should have made an offer, we should have made an offer of proof on AVI. I don't think that's required. We attempted to take an evidence that the foreman of PMC, we were precluded from doing that. The man had brain cancer. We were precluded from doing that because it was last minute. I concede it was last minute. We did put on somebody who testified as to what was happening during the cause of the accident, that Mr. Dunning got caught in a pinch point. As they were moving forward, as the fork is slowly moving this piece forward. The short answer is no, we did not make an offer of proof on any other evidence. But the inquiry is, where as a matter of law does the Illinois law support a directed finding against a defendant on this basis? Yes, it could have been rigged better. Yes, I think PMC should have rigged it differently. I get directed as a matter of law. It doesn't go to a jury on whether we exercise ordinary care. The court never looks at whether we had a duty to speak in the first instance. And top it off with the court directed a product's liability case against us. This product is unreasonably dangerous. This product is only made one and they didn't sell it to anybody. It doesn't fit the law at all. The law should matter here. If counsel had enough, if counsel put on a good case, if the court was moved by the drama of the cross-examination, that still goes to the jury. It was wrong to take it away. You can't direct that. We are crossing the cause as a matter of law. We don't even, the forklift driver never testified. Why is it that the fork moved like that? There's no testimony that all of a sudden something failed. That the pump tilted. It just simply goes in its path. Mr. Leary gets out of the pinch point and Mr. Dudley gets caught in it. How do you connect that to the cart or even the rig? I thought there was multiple testimony that it was wobbling, going back and forth. That's why the PNC, by the plumbers and pipefitters, moved in to try to make it go down the aisle straight, right? There is some testimony that it was wobbling. That converts it to a matter of law. That converts the liability of ABI to a matter of law. Not a question of fact to be argued to the jury. I understood you'd be saying that it was moving straight down the aisle and there was no problem. What I'm saying is the forklift driver didn't testify and we have no testimony that the pump itself moved in some unexpected fashion to pin him. It's simply going in a straight line to catch him in a pinch point. Mr. Hodges is at my side, which means my 12 minutes is up. Thank you. Thank you, Counsel. Counsel? Good morning, Your Honors. Counsel. May it please the Court. My name is James Hodges and I represent Dynegy Midwest Generation, which has been referred to as DMG. We're here appealing a jury verdict that was entered in St. Clair County. I'm not going to go through all the facts that you've just heard. I rely on my brief and the record for that. I'd like to say that Dynegy, I'll mess this up several times and I apologize. Dynegy asserts that it did not owe a duty to the plaintiff in this case and that a landowner, which we were in this matter, who employs independent contractors to perform work is generally not liable for the actual emissions of those independent contractors. And that was upheld in the First District case of Gregory v. Visa. The reason for that is that the landowner is not in a position to supervise the detail of the independent contractor's work and is therefore not in a good position to prevent the negligence. However, we do have an exception that the Restatement Second has provided us, which is that if a landowner retains control over any part of the independent contractor's work, the landowner would be subject to liability for the harm to others when he fails to exercise that control and reasonable care. And here the landowner was operating the forklift that was pushing the cart. It was, Your Honor, and the evidence is that there was no evidence that the forklift driver or the forklift malfunctioned and I will get to that. For the exception to apply in this case, as the plaintiff feels it should, DMG must have retained at least some degree of control in the manner of the work that was done by the independent contractors, in this case ABI and PMC, so that they were not entirely free to perform the work in their own way. In this case, ABI and PMC both were able to work free of DMG's provision. DMG did provide a forklift at the request of either ABI or PMC to move this pump. The forklift was then rigged to ABI's cart by PMC employees. And again, there was no evidence at this point, or throughout the case, that DMG exercised any control in the movement of the rigging process or in the control of how the independent contractors went about this work. The injury to the plaintiff was not reasonably foreseeable by DMG, as the independent contractors combined for two factors. One, there was a defective cart, and two, there was loose or improper rigging, both defects provided by the independent contractors. This created a condition that the landowner, in this case DMG, could not guard against. Now, the Supreme Court, in private versus CTA, established four factors for duty. First, reasonably foreseeability of the injury. Two, the likelihood of the injury. Three, the magnitude of the burden of guarding against that injury and the consequences of placing that burden on the defendant. It was not reasonably foreseeable for DMG that ABI was going to furnish a defective cart, nor was it reasonably foreseeable that ABI's representative, Mr. Dosimo, who was on the scene, would fail to warn of the danger that he observed. To guard against these factors would require that DMG be clairvoyant, and that is just unreasonable. Again, DMG did not supervise the work done by the independent contractors. This incident was not foreseeable. Therefore, DMG did not complain to the duty, and therefore could not have been negligent. For argument's sake, assume that there was an injury. Let me make sure I understand. You're telling us that your forklift guy, who's pushing the cart down and can see that there are these pillars, you know, and the cart's wobbling back and forth and coming close to those pillars, it's not foreseeable to him that somebody might get pinched? Right, yes, Your Honor. The best people that understand are in a pinch, as counsel said, was the PMC employees were on the way. They were familiar with the pinch points. This was going over with them to keep their eye out. The forklift drivers were relying on them and their movement, because the way this huge pump is, that they would take it upon themselves and act reasonably to avoid that. So it's not foreseeable that somebody would stand there for a pump that's moving two miles or less an hour and get pinched between a pump and an IV that they were aware of. The trial court found, as a matter of law, that ABI was negligent in providing a defective cart and that they were strictly negligent. There was evidence from the witnesses that the cart was not doing what it was supposed to do. Not one witness pointed to the DMG forklift or forklift driver and said he wasn't doing what he was supposed to do or the forklift was malfunctioning. The evidence did show that the cart failed. The evidence did show that ABI's employee failed to warn DMG or the plaintiff of the loose rigging. ABI was there as technical support and using their expertise, as they are in the best position to provide that warning. ABI's own president testified that the only reason this cart moved was if the forklift driver was steering it properly, which, again, there was no evidence, or if the cart was not properly rigged, which we do know happened through Mr. Dosimo. So what do we have? We have a defective cart presented by ABI. We have a failure to warn by ABI. We have loose rigging performed by PMC employees. Those are the proximate causes, not the forklift. Finally, DMG contends that the jury's verdict is against the manifest way of that evidence. The evidence of the trial was that ABI's cart was defective. That ABI employee, Scott Dosimo, knew the rigging was incorrect and said nothing. Why did he say nothing? His own testimony was he didn't want to be liable. ABI's own president testified that the cart went side to side because it was not rigged correctly. These are all actions by PMC and ABI, not DMG. The evidence did show that DMG owned the property, that DMG owned the forklift, and that DMG provided an operator. There was no evidence that either the forklift malfunctioned or the driver acted inappropriately. There was no evidence, as DMG's counsel puts in his brief, that the operator drove the load into the steel beam and crushed the plaintiff. And there was no evidence that DMG exerted any control over the actions of the independents. The testimony was that the ABI cart went side to side because of its rigging and because it was defective, which was held as a matter of law. And that the plaintiff became caught between that I-beam as a result of that defect. The jury's verdict placing 47% fault on DMG in this case was clearly against the manifest way of that evidence. It was not supported by the physical evidence. It was not supported by the testimonial evidence. The circuit court therefore erred in denying DMG's motion for a trial or an alternative for a J&OB. DMG is here now before you to request a new trial or a reversal of the court's denial of its motion for a J&OB. Thank you. Thank you. Thank you, counsel. Counsel? In the case of the court, counsel, whose fault is it? You say it's his fault. He says it's your fault. It's both of your faults. That's what the jury instruction says. It says more than one person can be responsible for an accident. And this was a case that I think is pretty straightforward. I think it's pretty straightforward. It's just that you never managed to work him in my finding. And it worked. The movie is tough. It weighs 14 1⁄2 tons on the cart, this firm called ABI. But it's being powered by DMG. Now, for DMG, we have to be fair. DMG tried the case in a certain fashion. It could have worked. It didn't, but it could have worked. And their strategy was clear. Their strategy was to join with me in blaming ABI. It was a trial strategy. It almost worked, but it didn't work, because the jury made the conclusion that the operator of the cart or the operator of the forklift had responsibility. And, of course, the basis for the duty comes from 414. I mean, 414 says one who entrusts work to an independent contractor but who retains control of any part of the work is subject to liability for physical harm to others for whose safety the employer owes a duty of reasonable care which is caused by his failure to exercise his control with reasonable care. That's the forklift truck. He drove the forklift. It had a responsibility to use reasonable care. The jury made the determination he didn't, because, if you still properly point out Justice Brewer's decision, he is driving the cart, and he drove the cart into a pole. And my guy got a cry. I think it's pretty clear that a jury can conclude, based on those facts, that DMG bears some responsibility for this accident. And I think, on top of that, they also own the premises. So they also have a responsibility to warn about those conditions. And you can't blame the plaintiff, because we had a case years ago called Diver. In Diver v. Bauerweiler's sentence, it takes the Bork v. Capewell doctrine and extends it and says that if there are reasonable distractions on the part of the plaintiff when he's trying to push the cart, then the plaintiff, you have a responsibility to warn him. So I think the case against DMG, with complete respect to my friend Mr. Hoppes, who I enjoy having on my side all the time in trial, but who's not on my side now, I believe is pretty straightforward. Judge, in response to your inquiries about the righteous indignation that was emanating from my learning and the esteemed colleague, first off, page 354 of the record. So basically, this is what I asked Dosimo, what's your business is. If you go to places like DMG and you provide your expertise, the connection with removing, transporting, maintaining, repairing pumps, and then putting them back, answer true. This is Dosimo. The guy can tell you he's getting paid about $570 a day, was what he was being paid. And that's what you did here. Answer yes. Or that's what you were contracted to do, wasn't it? Answer yes. Page 358. But what it says here says that you propose to do is to provide supervision, labor, and parts to remove, transport, disassemble, inspect, repair, reassemble, install, and start up. Am I correct? Yes. And that's what you were paid to do. Correct. There's your duty. That's what it comes down to. They took it, they assumed it, they acknowledged it, they admitted it. Now we go to the next thing. You're involved in providing assistance, getting them safely out of buildings, on the carts that you furnish, and on your flatbed. That's one of the services you offer to the client. Answer correct. Page 361. Next question. What about your expertise? Well, you guys have been working with this cart. Nobody else has ever worked with this cart before, regardless of their project. My question is, nobody had worked with this cart besides you. This is all those of you. Answer correct. Page 371. Page 372. The day that the cart was moved, the day that my client got in touch, was there anybody at that job site that knew more about the job than you? Answer no. Then it goes on and it says, how then, how could it be, and you knew from your prior experience that the safe way to push the cart would be for the forklift to be squared up, didn't you? He knew it, but his cart. They move these pumps, they come into companies with their cart, and they provide the cart, and they tell people, they know from prior experience, that the way you stopped the cart from wobbling, there were three things that caused the cart to wobble. And the jury is so fine. One thing that caused the cart to wobble was the cart. The cart wobbled. The cart was on the front and effectively on the side. It had a tester lock that you didn't tell anybody about it, which I thought was kind of interesting. The second thing that caused it to wobble was the fact that the way it was rigged, they didn't square, the forklifts square up against the pump. When they don't square it up against the pump, but instead they attach it with chains and chain pulls, then by definition, if you're driving it, you're going to get very, because you don't have tension one against the other. The responsibility for rigging, the jury could easily have found that it was AVI's responsibility. They could have easily found that perhaps Dyer and Gee had responsibility. It doesn't make any difference because what we do know is that AVI was contracted for their expertise, and we do know that this man, Dosimo, said that the reason that the cart was going to use my one, Swigly, which is on page 391, was because of how it was rigged. He answered line six correctly. He admitted it. He admitted that that's why it was going crooked, because of how it was rigged. Then I went on to ask him, I said, next question. And you then saw the cart start to wobble. What happened? These guys jumped in, didn't they? The working guys, yes. They jumped in to steer the cart, didn't they? Tried to. You saw them do that, didn't you? Yes. Now at this point, he's watching the play. I used that expression, the play in front of him, and he's watching the play in front of him, and he's watching this cart move slowly towards this IV. This vehicle pulls, and my guy is pushing it, and he doesn't know that he's moving it. And this guy's standing right in front of him. He's watching. And he said, you admitted, sir, that had you been paying attention, you could have warned them. Didn't you admit that? He said, yes. He admitted it. He said, I wasn't looking. I'm standing there, and here's what happens. He was impressed. I said, why were you standing over there? Remember his answer? He said, I was getting out of harm's way. Let me get out of harm's way. But while your guy's over there, if I was paying attention, I could say, hey, Gerald, get the heck out of the way. But he didn't do that. Why? He wasn't paying attention. But it gets even worse, because you want to talk about admissions, judicial admissions. The jury heard their case. They got to the jury. The jury gave him 37%. I mean, but then you want to go further, because this was a beauty. And I said to him, I said, as it would relate to what the proper way to do it is, we had two exemptions, 7 and 8, which were in the record. Now, I said to him, with respect to what's depicted in 7 and 8, I said, it's just that that approach, which is depicted in 7 and 8, showed how they had it rigged. And I said, no, they had it rigged that way. Now, is that safe? No. For purposes of pushing forward, that's not the safe way. What's the safe way? Exhibit 16, which is how they did it later, after they moved it back later on. And then I said, at that point, I said, now, when they're rigging this cart, you're standing there watching them rig it. You're the expert. You're being paid $500 that day. And on top of that, you assume the community contract. And I said, well, it's no waste. You've got it right in front of you. You're watching them rig it. You know they're going to rig it the way that you know it's going to cause the wheels to go sideways. You know how the cart operates. You've seen this done 100 times before. Why in the world didn't you just tell them to take the cart, take the fork, shove the fork flush up against the cart so he doesn't wiggle? And then we have the answer. The answer is that we'll go down in infamy. Because of liability, for me to tell them how to rig something automatically puts liability onto me, which I'm not there for. Well, unfortunately, the jury thought of it. The jury thought that maybe that didn't put liability on me. And then, of course, it points back. That's what happened. The only other witness, you asked me how often is proof. They only had two witnesses. They could understand. Judge Gleason is hearing this case. What he's hearing is what you just heard today. He's hearing a diary sheet laying, he's hearing ABI laying a diary sheet. That's all he's hearing. So it wasn't the drive-by fraud at the Amnesty Council. It was the evidence that was being heard. Now comes Burrell. Burrell is the owner. He's their only other witness. So they don't have any other witnesses. We have 213. There's nobody else. Now Burrell comes up. He just said, quote, Mr. Burrell, you understand how it was rigged, page 492. What you're telling the jury is that the way it was rigged, it was unsafe. Answer? Yes. He said it was unsafe. He's the owner of the company. It goes on to say, and if he, meaning Dulce, was getting paid this money, if he saw something he thought was unsafe, would you expect him to say something? Absolutely. Didn't say a word. Is he no legal? You're no legal? He was the money. He wasn't Paul. Then we go further. So that there's no misunderstanding, answer page 497. You're here to tell me, as the head of this company, that Mr. Dulce, who admitted that he saw something unsafe and didn't say anything, he should have said something. Am I correct? Answer? Yes. But you're telling me you're not liable under those facts? What do we have to do to be informed in this country? And then we go further, page 545. He testified that the way that the card was rigged, he said it was unsafe. Did you hear him say that? So there's no misunderstanding. He was sitting there. He was the company where I was sitting. Guess what? Yes, I heard him say that. In addition to that, sir, he not only said it was unsafe, he also said that there was a safer way to do it. Didn't he? Page 545, 914. Answer? Yes. And he also admitted that he never told anybody, didn't he? Answer? I believe that was his testimony. Yes. And then at that point, and I'm asking you whether you approve of that as his boss, and his answer was absolutely not. And he said, hey, I said, he should have said something, shouldn't he? He said yes. And I said, did you hear the answer that he gave? And he said yes. I said, what did he say? He said he did not want to be liable. I mean, this is morale. He's admitting this in front of the judge. This isn't a problem of cross-examination. This is a judge sitting there looking at a case, knowing that the man has run into the side of a pole. He knows that the rape is being driven by DNC. He knows that the people from AVI have assumed the responsibility to be in charge of the raping. He knows the AVI guy says it's unsafely raped. He doesn't say a word. And then on top of that, even after he allows it to leave with unsafe raping, what's he then do? He's got the player right in front of him, but he's not paying attention. He's standing six feet in front of him, and he yelled, wasn't you, Gerald, and you should have. And his boss condemned all of that. And they want you to let them know. I don't understand how this works, but I think that the world is getting kind of strange, and it's getting past me. Now, the other thing I'd like to point out is this. This is how I'll say it. I agree. I'm going to be really honest with you. I've got to be honest. I've got to be honest with you. I thought the process was pretty good. I mean, I understand it wasn't a lot of time, but so there's no misunderstanding. Here's what the admission is. They have this card. Now, you don't have to, this card was designed by this guy, Mr. Burrell. And that said, question, page 367. And I ask this of those of you. I said, so in fact, you had a situation where your company designed, manufactured, assembled, and leased this card to DMG, correct? Yes. And you were paid for it. Yes. In addition to that, that is part of your business, is it not? Yes. These are pre-admissions. I think that's pretty well history in the world of private liability. And then I said to him on page 360 as it relates to this card, you did lease the transportation card, did you not? Yes, sir. Yes, I guess we did. And then, of course, we go further. And we get to the next thing, which has to do with Burrell. See, the problem with the card is that the wheels are locked. But, of course, that sometimes the wheels have to lock. That's a shopping cart, right? I mean, it's a shopping cart. You push it around, and they have to get it. But sometimes you want it to go straight north and south without locking. And there's a way to do it. And I was going to cross-examine it during the trial with this thing that I found on the Internet. It's called a caster lock. You just make these wheels. You put them on, you know, instead of them spinning, you just take this lever, and it locks the caster. And then the wheels go straight when you want to go straight north and south as opposed to being Peterson, you know, running side to side. Which, at the time, was a good analogy. That was before he was a kid. If I had to do a right to pick a different right. Having said that, so I say to the guy, I said, have you ever heard of a caster lock? And I'm here to tell you something that just floored me. He said, well, yeah. There's one on this cart. First time we ever were told that the cart actually had a caster lock. The problem was, it said it had a caster lock, but he didn't tell Dosimo. So Dosimo's using this cart all of these years. It's got a caster lock, and according to Burrell, it was there, but he didn't tell Dosimo. Therefore, Dosimo didn't tell anybody else. Therefore, the part of the cart, they call it, which was the lock of the wheels, which could have been addressed with a caster lock. There was only one person who knew that it had a caster lock, and that was Burrell. But he was back in New York, and he didn't tell anyone. And so there's your problem. And so I got admissions. They admitted. I can read the admissions to you. I can read the admissions. They admitted. They said the cart, if it's used in a reasonably foreseeable fashion, isn't it supposed to be straight? People can reasonably anticipate that. That's consumer expectation. He answered that, yes. Is it reasonably foreseeable that the cart will wobble? Yes. If it's wobbling, can it expose the person to harm? Yes. All of those were admissions. That sets up the consumer expectation. And under the Ford case, as you know, we now have to work in risk utility. So now we have a question of consumer expectation and risk utility. But risk utility, that becomes part of the equation under consumer expectation. What's the risk utility? Well, is there a feasible alternative design? How much does it cost? Will it affect the utility of the product? Well, all of those questions were answered by Mr. Burrell because he put it on there. It didn't affect the utility of the product. The only problem was he forgot to tell people. Now, there's a hierarchy if you have a product case. You take the defect out. You can't take the defect out of the cart. You can't get it out of the cart if you want. He actually had a cart. He actually devised a cart. But since he didn't tell anybody the minimum, he had one. And so there's the product case, and those are all the minimum. I mean, everything about that was admitted. And everybody in this case, both Bolsonaro and the other guy, admitted it. If you want to take away the product's count, fine. Take it away. Take it away. Save me even enough time. But I didn't have an expert. They didn't have an expert. They didn't say that they needed an expert. But if you want to take away the product's case, that's fine. But how do you take away SAAB on the written case? Honestly, from the standpoint of my client, you want to take that one away? That's still fine because I still have dynergy because I don't think there's any way in the world that there's any conceivable set of facts where dynergy can escape liability in this case under 414, the operator of the forklift. And just because they relied on somebody else, the law was always doing it. There was more than one person who could be responsible for the accident. And the forklift driver drove the forklift with the cart into a pole and crushed the client. And the jury found that. And they had control of that forklift, and they had control of the property. I think that ABI, for ABI to stand here and say that with the tone, they can't believe they were directed out, the judge knew these were their only two witnesses. They're the only two witnesses that were enlisted on 213. And those two witnesses have testified. I just mentioned what they said. They specifically, all of them, did. One time after another that it was rigged, it was rigged improperly. That could cause the part that contributed to the wheeling wheels. In addition to that is that the guy had an opportunity to warn him. He kept his mouth shut because he wasn't paying attention. They said all of that. What were they going to say if they put a case on, if these were their only two witnesses? There wasn't a matter of offer of proof. These were their only two witnesses. Now, here's one last picture, which I thought was really interesting. And that's, there's a gorilla in the room. I don't, I missed my phone number. There's a gorilla in the room that everybody's not talking about. They never sued each other. I mean, ABI never filed suit against DMG. That was the problem. That's why ABI wanted to then put out a case against DMG. But they didn't have a case against DMG because ABI chose not to file a claim against them. And DMG didn't file a claim against ABI. And the forklift operator never got called to testify. And you were called in. And so the jury's sitting there, and you're telling me the jury's sitting there, and you're trying to get his email. And the jury's sitting there, and you've got a case against DMG. And you've got a forklift operator. And DMG says it's not our fault that they don't call the forklift operator to testify. And, of course, ABI wants to call them, but they can't because DMG objected because there's no cross-claim. That's how you get a verdict. So I don't know whether I won it or they lost it, but either way, it should be a verdict. Questions? Okay, thank you very much. Thank you. Counsel? I'm just going to address a few points. The entire argument we just heard would have more weight and more power if the case had been sent to the jury. A lot of the things that counsel just argued, and he's effective. If they had been decided by the jury, yes, you should have warned of the rigging, okay? We find that you should have. The jury wasn't even told what conduct of ABI they were comparing. There was no instruction on it. Take a look at the record on that. Just one line. Whatever they did. That allows the jury to speculate. The products count. One cart. The law says you have to be in the business of placing the product in the stream of commerce. One cart, in this case, one rental. The testimony was we didn't normally rent it. We're normally doing the whole job. We use it for our business. So, Luna's right on point here. It was a general verdict, wasn't it? I mean, the jury didn't, the jury, I mean, it was as far as negligence or products liability in terms of them determining your percentage of fault. The judge only sent count one, only sent one count to the jury. He didn't send the products count to the jury. He just used the finding against PMC on the products count. That's error two. Okay? Again, the law seems to have been shifted to the side here for expediency's sake. The products count, they should have been comparing the product, if he wanted to go through with the product, to the PMC. It's a different analysis than the other count. Yeah, he sent one count through and then they split it up. But DMG gets to get up and argue the whole thing. Again, not my comment. I didn't cause it. We should have been allowed to do the same thing on the negligence count if the court felt the evidence was sufficient to put it through, if they found we had that duty to warrant. Now, if you look at this testimony and say, well, he just read you, he just, counsel just read testimony. That's great. In my brief, I have it. Dosey will also set it at other points in time. I warned them. I told them to re-rig it. I thought they did re-rig it. Okay? So look at your own brunette case because this decision is great on judicial versus evidentiary. Deliberate. Clear. Unequivocal. Statement of a party about a concrete fact within the peculiar knowledge of the party, not the party's employee. So that's different from an evidentiary admission.  And throughout this, and I have put it in my brief, throughout this, the law matters. We're asking you to reverse. We're asking for this to be sent back. We asked for that directed verdict on the products because this set of facts, there's no experts, Your Honor. We asked for the continuance. You're going to sue us in products. We want an expert. Five plus four, four trial days, that whole business stays out when we get sued in products liability. And the target's on us, and there's no question there was a strategy to put the bullseye on our back. But that doesn't mean you can put the law to the side. So, again, if I was arguing off a jury verdict here where things had not been directed against us, including primary cause, and you find me the case, there is nothing cited, find me the case that said you direct proximate cause on the basis of a judicial admission. It would be one rare instance indeed. Thank you, Your Honor. I'm asking for a reversal. Thank you. Thank you, counsel. We appreciate the briefs and arguments of counsel. We'll take the case on their advice.